**CHICAGO SOUTH SHORE AND SOUTH BEND RAILROAD, W. P. Coliton and Robert C. Gasser, Plaintiffs,**

v.

**MONON RAILROAD, William C. Coleman, John B. Goodrich, et al., Defendants.**

**No. 64 C 1003.**

United States District Court
N. D. Illinois, E. D.

Sept. 17, 1964.

Samuel H. Young, Hough, Young & Coale, Chicago, Ill., for plaintiffs.

Merrill Shepard, Pope, Ballard, Uriell, Kennedy, Shepard & Fowle and Robert Thorsen, Madigan & Thorsen, Chicago, Ill., for defendants.

MAROVITZ, District Judge.

Defendants' motion to dismiss the Count I of complaint.

This action is before the Court today pursuant to plaintiff's motion to temporarily restrain and enjoin defendants from making further purchases of stock in plaintiff railroad, until such time as the Interstate Commerce Commission (ICC) may determine the legality of said acquisition. Defendant has moved, in response, for a dismissal order, on the grounds that the Court lacks jurisdiction over the subject matter of the complaint.

Count I alleges that plaintiffs have filed a complaint before the ICC alleging violations by defendants of Sections 5(2) and 5(4) of Part I of the Interstate Commerce Act (ICA). (Secs. 5(2), 5(4), Title 49 U.S.C.) Said Sections prohibit the acquiring of "control" of one "carrier" by another, without prior ICC approval.

More specifically, it is alleged that the defendants are presently engaged in, and will continue to engage in the acquisition of shares of the capital stock of the plaintiff railroad in such amounts, that, in the absence of an injunction order, the capital stock of plaintiff will be concentrated into a single large block, so as to preclude the South Shore from ever again being an independent railroad, even upon divestiture by the defendants.

Count II is brought under Section 16(a) of the Securities Exchange Act of 1934, and alleges that the aforesaid acquisition by defendants has not been reported as required by Statute.

Plaintiffs seek injunctive relief *pendente lite*, to maintain the *status quo* in the matter until such time as the ICC may determine the merits of the aforementioned complaint filed with it.

The issue raised by defendants' motion to dismiss concerns the jurisdiction of this Court over the cause before us. Section 5(11) of the ICA specifically states that "[t]he authority conferred by this section (to the ICC) shall be exclusive and plenary * * *." Despite this unequivocal language, plaintiffs seek an injunction today, to "preserve the status quo," arguing that such action would not interfere with the primary jurisdiction of the ICC, but would merely prevent irreparable injury until such time as the ICC may fully determine the merits of the complaint brought before it.

This Court cannot agree. A preliminary injunction will not be granted, merely on a balancing of the equities, as plaintiffs propose, but rather upon a *showing of probable cause for ultimate relief on the merits*. Acme Fast Freight v. United States (D.C.Del.1955) 135 F.Supp. 823; Corica v. Ragen, (7th Cir.,

1944) 140 F.2d 496; Vergas v. Shaughnessy, (D.C., N.Y., 1951) 97 F.Supp. 335.

Sections 5(4), 5(5), and 5(6) of the ICA are replete with narrow legalisms and terms of art. The phrases "control" and "carrier" are defined by the circumstances in which they arise, and are best applied by the administrative agency to whose care they have been entrusted. The Supreme Court has stated in Gilbertville Trucking Co. v. United States, 371 U.S. 115, 122, 125, 83 S.Ct. 217, 222, 223, 224, 9 L.Ed.2d 177 (1962):

> "Section 5(4) is part of a comprehensive legislative scheme designed to place ownership, management, and operational control over common carrriers within the regulatory jurisdiction of the Commission."

> "We * * * have left to the agency charged with enforcement, the determination from the facts whether 'control' exists, subject to normal standards of review. * * * In this manner, the Commission may adapt § 5(4) to the actualities and current practices of the industry involved and apply it to the extent it feels necessary to protect its jurisdiction under § 5(2) * * *."

■ Congress has wisely placed great confidence in the expertise of our regulatory agencies. That its intent was to create *exclusive* primary jurisdiction in the ICC in "control" matters of this kind is abundantly clear from the statutory scheme of the Act.

In Section 1(20) of the ICA, Congress gave the Commission authority to permit, or to prohibit the construction, acquisition or extension of a railroad line. Alongside this authority, however, the right of injunction of any contrary act was granted to the United States Courts, upon suit by the United States, the Commission, any affected regulatory body, *or any party in interest.* Under this provision, it has been held that a competing railroad may bring suit in a U.S. Court to enjoin a proposed expansion. Bremner v. Mason City and C. L. R. Co. (D.C.Del.1931) 48 F.2d 615.

■ Similarly, Congress has authorized injunctive actions brought by interested parties in U.S. Courts, to prevent enforcement of ICC orders. See Section 2321–2325, Title 28, U.S.C. Thus, Congress has twice granted private parties the right to seek injunctive relief in the Courts, while withholding such right with respect to Section 5 proceedings. When coupled with the specific authority granted to the ICC under Section 5(8) to obtain an injunction from a U.S. District Court, this information clearly demonstrates Congress' intention to bar such actions by *private litigants.*

Turning next to judicial pronouncements, we reach the same conclusion. In United States Nav. Co. v. Cunard S. S. Co., 284 U.S. 474, 482, 52 S.Ct. 247, 249, 76 L.Ed. 408 (1932), the Supreme Court reaffirmed the principle we today adopt. In discussing Board of Railroad Com'rs of State of North Dakota v. Great Northern Ry. Co., 281 U.S. 412, 50 S.Ct. 391, 74 L.Ed. 936 (1930), the Court stated:

> " 'The inquiry,' we said (pages 421, 422, of 281 U.S. [50 S.Ct. 391, 393]), 'would necessarily relate to technical and intricate matters of fact, and the solution of the question would demand the exercise of sound administrative discretion. The accomplishment of the purpose of Congress could not be had without the comprehensive study of an expert body continuously employed in administrative supervision. * * *'

> "[T]he judicial function does not entitle one to judicial relief until the prescribed administrative remedy has been exhausted." North Carolina Natural Gas Corp. v. United States (D.C.Del., 1961) 200 F.Supp. 745. A similar pronouncement by Judge Swan was quoted in the above case:

> " 'What the plaintiffs ask is that the court declare the rates unlawful without waiting for the Commission to have a hearing and render an opinion as to their legality. This

we may not do. The present application to the court is premature. The plaintiffs still have their administrative remedy of attacking the rates by formal complaint." National Water Carrier's Ass'n. v. United States, D.C., 126 F.Supp. 87, 90.

See also Akers Motor Lines v. Malone Freight Lines (D.C.Ala., 1950) 88 F. Supp. 654.

The most recent Supreme Court pronouncement in this area came in Arrow Transp. Co. v. Southern R. Co., 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963). In that case, the District Court refused to enjoin respondent rail carriers from putting into effect a reduced rate schedule, despite the "grave danger that irreparable injury, loss or damage may be inflicted on" petitioners, for which they would have no adequate remedy at law.

The Supreme Court, on certiorari, affirmed, stating at pp. 669, 670, 671, at pp. 990, 991 of 83 S.Ct.:

"A court's disposition of an application for injunctive relief would seem to require at least some consideration of the applicant's claim that the carrier's proposed rates are unreasonable. But such consideration would create the hazard of forbidden judicial intrusion into the administrative domain. * * *

"Moreover, such a procedure would permit a single judge to pass before final Commission action upon the question of reasonableness of a rate, which the statute expressly entrusts only to a court of three judges reviewing the Commission's completed task."

And so it must be today. This Court has been asked, under a "status quo" label to enjoin the defendants from acquiring "control" of plaintiff railroad. We are being asked to define that term, and to apply it in our search for probable cause. We are asked to usurp the function of a specialized agency uniquely qualified to deal with these matters. We cannot, and will not act.

Plaintiffs rely heavily, indeed almost exclusively, on Pennsylvania Motor Truck Ass'n v. Port of Philadelphia M. T. Ass'n (D.C., Pa., 1960) 183 F.Supp. 910. That case may be distinguished, as the Court clearly indicated the scope of its decision. After asserting at the outset, that jurisdiction to pass upon the "merits" of the basic controversy lay in the Federal Maritime Board, the Court decided that these "merits" were not before it.

"[T]he decision called for in the instant controversy *is in no way contingent upon the expertise of the Federal Maritime Board.*" (at p. 914) (Emphasis added)

Indeed, the Court there, being faced only with determining the existence of an agreement and the non-approval thereof by the Maritime Commission characterized its decision as being "no more difficult than [determining] the score of yesterday's baseball game." (at p. 915, quoting from River Plate and Brazil Conferences v. Pressed Steel Car Co. (2d Cir., 1955) 227 F.2d 60, 63.)

This is a broad step away from the issues now before this Court. By nature of the factual situation before it, the Pennsylvania Court felt unhindered by Justice Frankfurter's words in Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952). Faced with a variety of complexities, we feel constrained to listen:

"The Court thus applied a principle, now firmly established, that *in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over.*" (Emphasis added.)

We do not reach the question of substantial harm. But even here the Court would defer to the ICC and the Supreme Court, which characterize "divestiture" as a "drastic" remedy capable of restoring an injured party to the *status quo*

*ante.* Gilbertville Trucking Co. v. United States, supra, 371 U.S. at pp. 129, 130, 83 S.Ct. 217.

While we seek as an end at all times to effect substantial justice, the Court must be bound by jurisdictional limitations, if we are to maintain an orderly framework from which to operate.

Accordingly, we must yield to the primary jurisdiction of the ICC, prescribed by Congress, and dismiss Count I of the complaint before this Court.