671 F.2d 1085
 BROTHERHOOD OF RAILWAY AND AIRLINE CLERKS, CONSOLIDATED
SYSTEM BOARD OF ADJUSTMENT 46; Brotherhood of Railway
Carmen, Burlington Northern Joint Protective Board; Allied
Services Division, Brotherhood of Railway and Airline
Clerks; Brotherhood of Railway Signalmen; General Committee
of Adjustment, United Transportation Union No. 386,
Burlington Northern Inc.; Yardmasters of America;
Brotherhood of Locomotive Engineers, Burlington Northern
Inc.; and International Brotherhood of Electrical Workers, Petitioners,
v.
BURLINGTON NORTHERN INC. and United States of America, Respondents.
 No. 81-1661.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 15, 1981.
Decided Feb. 17, 1982.
 
 DeParco, Anderson, Perl, Hunegs & Rudquist, P.A., Patrick J. Foley (argued), Minneapolis, Minn., for petitioners.
 Frank S. Farrell, St. Paul, Minn., Louis A. Harris, Seattle, Wash., Robert T. Beam, Martin M. Lucente (argued), Thomas J. Gregg, Kirk B. Johnson, Chicago, Ill., for Burlington Northern Inc.
 Richard A. Allen, Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, Lawrence H. Richmond (argued), I. C. C., Washington, D. C., for respondents.
 Before LAY, Chief Judge, and HENLEY and ARNOLD, Circuit Judges.
 ARNOLD, Circuit Judge.
 
 
 1
 This is a petition for review of a decision of the Interstate Commerce Commission. On April 30, 1981, several labor unions representing Burlington Northern employees filed a petition with the Interstate Commerce Commission requesting that Burlington Northern Inc. (BN), then a common carrier, be prevented from transforming itself into a holding company. The request was based, in part, on the allegation that BN had misled the Commission in an earlier proceeding in which the Commission had unanimously approved the merger of Burlington Northern and the St. Louis-San Francisco Railway Company. See Burlington Northern, Inc.-Control and Merger-St. Louis-San Francisco Railway Company, 360 I.C.C. 788 (1980), to which we shall refer as the "merger order." Petitioners also claimed that formation of the holding company violated the merger order and that authorization by the Commission was required under various provisions of the Interstate Commerce Act, 49 U.S.C. § 10101 et seq., before the holding company could be formed. On June 5, 1981, in the decision we are now asked to review, the Commission denied appellant's petition. The Commission found that BN had not violated the merger order and that the holding-company transaction was not one which required the approval of the Commission. Great Northern Pacific & Burlington Lines, Inc.-Merger, etc.-Great Northern Railway Company, I.C.C. (1981). This petition for review followed.
 
 
 2
 The petitioners urge the following arguments: (1) that the Commission erred when it found that the formation of the holding company did not violate the merger order; (2) that the Commission erred when it determined that certain bond indentures did not forbid the formation of a holding company; and (3) that the Commission erred in holding that the Interstate Commerce Act did not give it jurisdiction to approve or disapprove the formation of the holding company. For reasons to be explained below, we reject the first two of these arguments and remand for further proceedings with respect to the third.
 
 I.
 
 3
 In 1977 a final agreement was reached to merge Burlington Northern with the St. Louis-San Francisco Railway Company (the Frisco), which, as we have noted, was approved by the Interstate Commerce Commission in 1980. The Commission's decision was affirmed in Missouri-Kansas-Texas R. R. v. United States, 632 F.2d 392 (5th Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 3004-05, 69 L.Ed.2d 388 (1981).
 
 
 4
 BN is a diversified natural-resources company as well as a transportation company. It owns considerable non-transportation assets, including coal, minerals, and timber. As a common carrier, BN had a limited ability to develop fully these non-transportation assets, because it could issue securities only with the approval of the Interstate Commerce Commission, and then only for a carrier purpose. See 49 U.S.C. § 11301(d)(1). In an effort to attain greater flexibility in the development of these assets and to expand its non-transportation business, BN's Board of Directors recommended a corporate restructuring which would result in the formation of a holding company. It was their judgment that the holding company would not be considered a carrier, leaving it free to issue securities associated with its non-transportation assets for any proper corporate purpose. On May 14, 1981, following a federal district court's denial of petitioners' request for a preliminary injunction,[1] BN shareholders overwhelmingly approved the formation of the holding company, by which BN then became a wholly owned subsidiary of the publicly owned holding company. The transaction did not, however, effect any transfer of assets from Burlington Northern Railroad to the holding company.
 
 II.
 
 5
 Petitioners' first argument is that the Commission erred in holding that the formation of the holding company did not violate the Frisco Merger Order, and therefore, that it acted arbitrarily by not reopening the Frisco proceeding. This argument relies on certain language contained in the Frisco Merger Order and other language contained in an appendix to the order summarizing BN's facilities. The cited language from the order is as follows:
 
 
 6
 The financial strength of BN is due in large measure to the existence and development of its nonrail assets.
 
 
 7
 360 I.C.C. at 798.
 
 
 8
 Applicants contend that the merged rail company would be enhanced by BN's nontransportation operations.... Applicants state that such nontransportation operations (particularly those involving timber and coal) permit BN to commit internally generated funds to capital intensive projects required by its rail service.
 
 
 9
 Id. at 814.
 
 
 10
 Applicants also state that Frisco's financial base would be expanded, because BN's internally generated funds from nontransportation activities would be available to the merged system.
 
 
 11
 Id. at 819. From the appendix petitioners cite the following:
 
 
 12
 Those in a position to control a railroad's actions can divert the carrier's income, property, and other assets for nonrail purposes. This opportunity exists to a significant degree when a parent holding company controls the railroad.
 
 
 13
 BN will not be in a position to form a holding company for many years due to bond indenture restrictions. Therefore, the opportunity for a diversion of assets to other sources does not presently exist. Also, the current management of BN appears to be fully dedicated to railroad operations.
 
 
 14
 Id. at 992-93. In petitioners' view these passages constitute an unequivocal prohibition against BN's formation of a holding company. The Commission, however, read its order differently, and found that it did not condition its approval of the merger upon BN's agreement not to form a holding company. The Commission also found that it had not been misled by BN.
 
 
 15
 The issue is whether the Commission erroneously interpreted its own prior order authorizing the merger. The scope of our review in such a situation is quite narrow. An interpretation "of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong ...." Red Lion Broadcasting Co. v. Federal Communications Commission, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969) (footnote omitted). A fortiori, great weight should be given here to an agency's interpretation of its own orders, and we, as a reviewing court, should follow that interpretation unless it is entirely unreasonable. Petitioners make no such showing here.
 
 
 16
 The Frisco Merger Order and Appendix contain two sections which refer specifically to conditions to be imposed on the Frisco merger, 360 I.C.C. at 950-58, 1179-82. No mention is made of a bar against the formation of a holding company. Thus, the order, on its face, does not impose the restriction alleged by petitioners. The passages on which petitioners base their argument are only general statements of expectation, not conditions imposed on the parties to the merger. The Commission's primary concern was not the corporate structure of BN, but whether the merger was likely to result in operations that were more efficient and less costly with no disruption in service. See 360 I.C.C. at 934-50. In addition, the bond-indenture restrictions, which the Commission took to be a primary guarantee against diversion of nonrailroad assets, are, so far as this record shows, still in full force and effect. The mere formation of a holding company does not put BN in a position to violate these restrictions with impunity, and we have no reason to suppose that it will attempt to do so.III.
 
 
 17
 These bond-indenture restrictions are the basis for petitioners' second argument. Petitioners contend that BN's Prior Lien and General Mortgage bonds issued in 1896 contain restrictions that preclude the formation of the holding company. BN concedes that the bonds may restrict the transfer of certain assets to a holding company, but argues that they do not bar the formation of such a company. Petitioners concede in their brief, p. 51, that they do not own any of the bonds in question here. Based on this fact the Commission concluded that the petitioners lacked standing to assert any rights under the bond indenture.[2] We agree.
 
 IV.
 
 18
 Petitioners argue finally that whatever the meaning of the merger order, or the significance of the bond restrictions, the Commission had jurisdiction under the Interstate Commerce Act to approve or disapprove BN's creation of the holding company. Section 11343(a) of the Act, 49 U.S.C. § 11343(a), lists the "transactions involving carriers" that are subject to Commission approval.[3] The portion of § 11343(a) relevant here provides for prior approval by the Commission where there is a proposed "acquisition of control of at least 2 carriers by a person that is not a carrier."[4] 49 U.S.C. § 11343(a)(4). Because BN's subsidiaries include several separately incorporated rail and motor carriers, petitioners asserted that the holding-company transaction would result in control of "at least 2 carriers." The Commission disagreed. The Commission considered BN a single, integrated transportation system, even though it is made up of several separate corporations. Under this "single system doctrine" BN was considered to be, in effect, one carrier.
 
 
 19
 This interpretation of § 11343(a)(4) (formerly 49 U.S.C. § 5(2)(a))-that acquisition of a single established carrier system, even if comprised of a number of corporate entities, is not subject to Commission jurisdiction-has been followed consistently by the Commission for the last 25 years. See Louisville & Jefferson Bridge & R. Co. Merger, 295 I.C.C. 11 (1956), aff'd on other grounds sub nom. Alleghany Corp. v. Breswick & Co., 353 U.S. 151, 77 S.Ct. 763, 1 L.Ed.2d 726 (1957).[5] Although this interpretation of the phrase "2 carriers" is by no means the only possible one, nor necessarily the construction we would adopt if we were free to decide the question independently, it is not unreasonable, and we therefore defer to the Commission's view of its own governing statute, especially since this construction has been consistently adhered to over a long period of time.
 
 
 20
 Petitioners argue, however, as a factual matter, that the Commission erred when it found that the holding-company transaction resulted in the "acquisition of control" of a single carrier only. They point to BN's relationship with several terminal and switching railroads in which BN owns less than a 50% interest.[6] These corporations are unquestionably outside BN's corporate family, and thus are not a part of the single, integrated system. Petitioners argue that an assessment of the degree of control in the corporate context involves many factors, and that actual control of a corporation is possible through ownership of less than 50% of the stock. So, they argue, BN is likely to have actual control of at least one or more of these terminal and switching railroads, and therefore the holding company transaction is an "acquisition of control of at least 2 carriers by a person that is not a carrier," 49 U.S.C. § 11343(a)(4).
 
 
 21
 The respondents contend that by their very nature the terminal and switching railroads are not subject to control by any one carrier, but are more properly viewed as "partnerships" in which no one partner has the ability to control the destiny of the corporation. These concerns, we are told, are jointly owned and operated by competing linehaul carriers and are located at points of junction in order to serve the limited function of allowing the free interchange of rail traffic. BN is said not to be in a position to control any of these carriers because the inherent nature of the companies and of the service they provide makes control by any one carrier impossible.
 
 
 22
 The respondents' argument on this point may be well taken, but we are at a loss to find any support for it in the Commission's order rejecting petitioners' request for investigation of the formation of the holding company. There is no mention of this issue in the Order of June 5, 1981. Respondents suggest that petitioners' argument was implicitly rejected by the Commission's otherwise detailed finding that BN was a single, integrated system. This implicit rejection is also said to be supported by the Commission's straightforward use of the single-system doctrine to find a lack of § 11343 jurisdiction in several similar cases where holding companies were created from railroads. See Southern Pacific Transportation-Merger, supra; Katy Industries, Inc., supra; Kansas City Southern Industries, Inc., supra. This analysis leaves us unsatisfied. We, as an appellate court, stand ready to defer to the Commission on findings of fact and, to a more limited extent, on conclusions of law. Here, however, the Commission made no specific factual findings or conclusions of law on this issue. We are unwilling to speculate as to the Commission's intentions, and therefore remand for further findings.
 
 
 23
 We intimate no opinion as to the extent or nature of the future proceedings necessary to resolve this issue. As respondents have suggested, the Commission only recently concluded an extensive, two-year study of BN and its subsidiaries in the Frisco merger case. The Commission may be able to take administrative notice that BN's interests in the terminal companies do not constitute control so as to confer jurisdiction under § 11343(a)(4). We in no way intend for the Commission to ignore what it already knows. We insist only that the Commission tell us what it knows, so that we can then, if another petition is filed by any party, decide whether the Commission's conclusion is a permissible one.
 
 
 24
 In sum, we hold that the Commission was within its rights in holding that the formation of the holding company did not violate the Frisco Merger Order, and that the union petitioners have no standing to assert a violation of BN's bond indentures. We also sustain, in general, the Commission's use of the single-system doctrine to define its authority under 49 U.S.C. § 11343(a)(4). The order denying the unions' petition for investigation will be vacated, however, and the cause remanded to the Commission, for such further proceedings as may be necessary to determine whether BN's interests in terminal and switching companies take this case out of the single-system doctrine and give the Commission jurisdiction over the formation of the holding company.
 
 
 25
 It is so ordered.
 
 
 
 [1]
 Brotherhood of Railway and Airline Clerks, Consolidated System Board of Adjustment 46 v. Burlington Northern Inc., 513 F.Supp. 1023 (D.Minn.), appeal dismissed, 664 F.2d 294 (8th Cir. 1981) (per curiam)
 
 
 [2]
 The Commission found that the State of Minnesota, a petitioner below but not a party to this petition for review, was a holder of some of the Prior Lien Mortgage Bonds. The Commission concluded that the State's interest in the bonds was not a basis for jurisdiction because the bonds were issued in 1896, long before congressional action subjecting securities' issuance to the jurisdiction of the Interstate Commerce Commission. The State of Minnesota has not petitioned us for review of this action, and we express no opinion as to the correctness of the Commission's view on this issue
 
 
 [3]
 The transactions covered by § 11343(a) are as follows:
 (1) consolidation or merger of the properties or franchises of at least 2 carriers into one corporation for the ownership, management, and operation of the previously separately owned properties.
 (2) a purchase, lease, or contract to operate property of another carrier by any number of carriers.
 (3) acquisition of control of a carrier by any number of carriers.
 (4) acquisition of control of at least 2 carriers by a person that is not a carrier.
 (5) acquisition of control of a carrier by a person that is not a carrier but that controls any number of carriers.
 (6) acquisition by a rail carrier of trackage rights over, or joint ownership in or joint use of, a railroad line (and terminals incidental to it) owned or operated by another rail carrier.
 
 
 [4]
 Petitioners also argue that the holding company should be considered a carrier and thus subject to the Commission's jurisdiction under §§ 11301(b)(1) and 11348(b). This contention is meritless. At the time the holding company acquired control of BN Railroad it was not engaged in any business, it did not propose to become a carrier, and it did not control any carriers. We also reject petitioners' reliance on § 11348(a). That provision would come into play only if the holding-company formation is a transaction listed in § 11343(a)
 
 
 [5]
 For examples of this same interpretation, see Southern Pacific Transportation-Merger, 334 I.C.C. 866, 870-71 (1969); Katy Industries, Inc., Control-Missouri-Kansas-Texas R. Co., 331 I.C.C. 405, 411-12 (1967); Kansas City Southern Industries, Inc., Control, 317 I.C.C. 1, 3-4 (1962)
 
 
 [6]
 In the verified statement of William F. Thompson, Senior Vice President-Operations, Burlington Northern, Inc., BN acknowledged its interest in the various switching and terminal companies. Mr. Thompson testified:
 BN also owns various interests in certain switching and terminal companies such as The Belt Railway of Chicago (7.7%), Pueblo Union Depot (25%), St. Paul Union Depot (40%), TRRA (12.5%), Illinois Terminal Railway Company (18%), Kansas City Terminal Railway Company (8.3%), Denver Union Terminal Company (16.7%), Houston Belt and Terminal Railway Company (12.5%), Wichita Union Terminal Company (33.3%), and several others, but does not control, manage, or set policy for any of these companies. BN simply has representation on the Board of Directors of these companies. These carriers are not a part of the BN system although extensive use is made of their facilities by BN in the course of the transportation service it performs for the shipping public.
 Petitioners' Appendix p. 79.